49 N.J. 194 (1967)
229 A.2d 516
IN THE MATTER OF THE FORMAL COMPLAINT BY THE TOWNSHIP OF MORRIS, ET AL. AGAINST THE TOWN OF MORRISTOWN.
THE TOWNSHIP OF MORRIS, ET AL., PLAINTIFFS-APPELLANTS,
v.
BOARD OF PUBLIC UTILITY COMMISSIONERS OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS-RESPONDENTS.
The Supreme Court of New Jersey.
Argued February 20, 1967.
Decided April 24, 1967.
*196 Mr. Howard T. Rosen argued the cause for appellants (Messrs. Clapp & Eisenberg, attorneys; Mr. Arnold T. Mytelka, on the brief).
Mr. Myron J. Bromberg argued the cause for respondent Town of Morristown (Messrs. Porzio, Bromberg & Newman, attorneys).
Mr. William Gural, Deputy Attorney General, argued the cause for respondent Board of Public Utility Commissioners (Mr. Arthur J. Sills, Attorney General of the State of New Jersey, attorney).
The opinion of the court was delivered by FRANCIS, J.
The issue to be determined here is: When a municipally owned and operated waterworks and distribution system furnishes water to consumers in adjoining municipalities, are the rates charged such consumers subject to the regulatory power of the Board of Public Utility Commissioners? *197 The Board held it lacked authority to deal with the matter. We certified the ensuing appeal from that determination on the joint petition of the interested parties, before it was heard in the Appellate Division.
On December 15, 1923 the Town of Morristown purchased the waterworks distribution system of the proprietors of the Morris Aqueduct. At that time the system supplied water to Morristown and portions of Morris Township (which virtually surrounds Morristown), Harding Township, Mendham Township, Hanover Township (now principally Morris Plains), and parts of the Townships of East Hanover and Parsippany-Troy Hills. Since that date the Town has continued to serve its own inhabitants, as well as those of the other communities on the Morris Aqueduct's mains and pipes then being served. The acquisition and the continuance of the extra-territorial service appears to have been authorized by chapter 152 of the Laws of 1917, Article XXXII, sections 1(a), (c), (d) and 16 (Home Rule Act; now as revised, R.S. 40:62-49 d, f and 40:62-85).
From 1908 until June 6, 1931, the Normandy Water Company owned and operated a waterworks which supplied water to residents of the eastern portion of Morris Township. It is clear that after acquisition of Morris Aqueduct and before October 1930, Morristown had been furnishing water to residents of other portions of Morris Township. Thus, Morris Township consumers were being served by two independent water utilities, one publicly and the other privately owned. According to a report of the Water Committee of Morristown, which was made part of the minutes of the October 30, 1930 meeting of the governing body of the Town, the Normandy Water Company was being offered for sale, and a number of chain water companies were interested in acquiring it. The Water Committee set forth its view that Morristown was the logical purchaser. Another report of the Committee expressed the opinion that it was not "in the best interest of the Town of Morristown to have a private water company located in the center of a district supplied by the Town of Morristown."
*198 On June 6, 1931 Morristown purchased the franchise and waterworks of Normandy and has operated in its territory ever since. In the same transaction the Town also acquired the Whippany Water Company and began to serve its consumers, who were residents of the Whippany area of Hanover Township.
On December 12, 1966 the governing body of the Town of Morristown by resolution adopted a 30% rate increase for metered water service to be effective January 1, 1967 and to be applicable throughout the system then served by it. Plaintiffs, the Township Committee of the Township of Morris, and certain person individually and as members of the Township Committee, filed a petition with the Board of Public Utility Commissioners challenging the rates as unreasonable and discriminatory as to residents of Morris Township (and other communities outside Morristown), and requesting that they be denied enforcement. Morristown moved to dismiss the petition, alleging lack of jurisdiction in the board to entertain the proceeding. The motion was granted on the basis of the decision of this Court in In re Glen Rock, 25 N.J. 241 (1957). In our judgment that case is not controlling and for reasons to be outlined the order of dismissal must be reversed.
The Township of Morris claims that Morristown acquired the Normandy Water Company by virtue of chapter 222, Laws of 1929 (now, as revised, R.S. 40:62-49 d and f). In its original form that statute provided:
"Any municipality not owning and operating a water-works system or plant is hereby authorized to acquire by purchase, lease or condemnation, an existing water-works system or plant and its real estate, personal property and works, and all its corporate rights, powers, franchises and privileges or any part thereof, for the public and private uses of such municipality. Where the supply of water is from more than one source, or the distribution plant to be acquired is connected with a distribution system of the owner in an adjoining municipality, both of which are served with water from the same source or sources, it shall be lawful for such municipality to purchase * * * not only the source or sources of supply as aforesaid and the distribution system in said municipality but also the distribution system in the adjoining municipality." *199 Morristown contends the purchase was made pursuant to Article XXXII, section 1(c) of the Home Rule Act, chapter 152, Laws of 1917, which confers authority on any municipality to purchase from any person or corporation owning a waterworks "supplying such municipality with water or adapted to furnish such supply." But Normandy was not supplying Morristown with water, nor is there any proof that it was adapted to do so, or was intended to be adapted to do so. It was an independent private utility operating in one portion of adjoining Morris Township, with the waterworks already owned and operated by Morristown serving other portions of the Township. The Normandy franchise empowered it to supply water to the "Township of Morris and the inhabitants thereof." The municipal boundaries apparently were the only limitations on the authorized service area. Thus as Morris Township grew, it was entirely conceivable that both Normandy and Morristown would come into actual competition as each extended its mains to meet the consumers' need for water. The two waterworks were potential competitors when Morristown bought the Normandy franchise, and it seems certain they were on the way to actual competition  not for the business of Morristown residents, but for that of the Township people. Undoubtedly realization of that problem led the Water Committee in October 1930 to express the view that Morristown "should acquire the properties of the Normandy Water Company if it can be shown that there is a necessity to acquire its water supplies to protect those already owned by the Town and that the Town will receive a fair return on the price." It is probable also that the potential competition led the Committee to say further: "We feel that it is not in the best interest of the Town of Morristown to have a private water company located in the center of a district supplied by the Town of Morristown." The facts made available to us stimulate the view that a primary factor in the acquisition of Normandy was elimination of a probable competitor, not for the service of Morristown's own people but for the service of residents of Morris Township, where Morristown *200 was operating beyond its own borders and in a proprietary capacity.
Morristown points also to section 16 of Article XXXII of the Home Rule Act of 1917, supra, as further support for its position that the Normandy purchase was made under section 1 (c) of Article XXXII. Section 16 makes it lawful for any municipality owning or controlling waterworks to supply water to dwellers in other municipalities through which their mains may pass "upon the like or as favorable terms and conditions as water shall be furnished to dwellers within such municipality for the supplying of which with water such water works shall have been organized or established." (Emphasis added) But Normandy was not established to serve Morristown residents; its franchise was limited to a Morris Township operation, and it was not supplying Morristown at the time of the sale to the latter.
A reading of Article XXXII in its entirety indicates that its prime purpose was to enable a municipality to purchase a waterworks and distribution system in order to supply its own inhabitants with water. A further intention was that if the basic source of supply was outside the purchaser's borders, and the mains carrying the water into the purchasing municipality passed through another municipality, the purchaser could lawfully supply water to consumers in the other municipality.
Sufficient has been said to indicate that doubt was justifiable as to whether the cited sections of the 1917 Home Rule Act clearly empowered Morristown to purchase the Normandy franchise and waterworks. The record does not show how long prior to October 1930 Normandy was up for sale, nor for how long the chain water companies and other persons had been looking into its purchase. It does appear that in 1929 the then senator from Morris County introduced the bill which on April 29, 1929 became chapter 222 of the Laws of 1929. The bill was submitted as a supplement to the Home Rule Act. The language of the statute as adopted, which it is fair to say is not a model of clarity, is susceptible *201 of the interpretation that it was designed to aid Morristown and similarly situated municipalities. A new statute was not needed to enable the Township of Morris to acquire Normandy. Such authority already existed under section 1 (c) of Article XXXII of the Home Rule Act of 1917, which empowered a municipality to purchase a waterworks which is supplying its residents with water. On the other hand, it was questionable whether Morristown, not owning a plant in the adjoining Township of Morris where it was obliged to serve some of the consumers residing there simply because its mains happened to pass through their section of the Township when the Morris Aqueduct was acquired, had authority to buy an independent existing plant in the Township in order to expand Morristown's public and private water distribution to cover the entire Township as it grew and its needs increased, and thus avoid possible excessive drain on Morristown's existing supply. So, despite the unclear language, it seems more reasonable to construe chapter 222 of the Laws of 1929 as authorizing Morristown to purchase Normandy not only to safeguard its existing water supply, but also to eliminate a competitor whose competition was limited to areas beyond Morristown and solely within the boundaries of the adjoining Township of Morris. Such is the view expressed by the Deputy Attorney General appearing for the Board of Public Utility Commissioners at the oral argument, and we find it persuasive.
Moreover, in Woodside Homes, Inc. v. Town of Morristown, 26 N.J. 529 (1958), which arose out of the purchase of the Normandy Water Company, Morristown asserted and this Court agreed that the acquisition was authorized and made pursuant to R.S. 40:62-49 (d) (originally chapter 222, L. 1929). The Town's brief said:
"Morristown's statutory right to acquire the system in issue clearly stems from this statute (R.S. 40:62-49 (d)) and having acquired it thereunder, it is equally clear that it purchased with knowledge that its obligation was a mandatory one to continue to `furnish and supply water to the adjoining municipality (Morris Township) in which the connected distribution system is located * * *.'" *202 And it said further that Morristown "acquired the water system from Normandy Water Co. in July, 1931 under the express authority of chapter 222, L. 1929 (now R.S. 40:62-49(d) and (f)) and is therefore subject to the duties and liabilities therein set forth." This Court accepted Morristown's position saying:
"R.S. 40:62-49 (d) supplies the basic statutory authority for the acquisition of private water companies by a municipal corporation. When the Town of Morristown acquired the Normandy Water Company it did so by virtue of this section." 26 N.J., at p. 538.
Everyone agrees that when the statutes of our State were revised in 1937, chapter 222 of the Laws of 1929 was integrated with the Revised Statutes, Title 40, Municipalities and Counties, Article 8, entitled "Water Supply" and became R.S. 40:62-49 thereof. See, Revised Statutes, Tables, Session Laws 1929, p. 565. The 1929 act had not been amended or supplemented in the interim. In working the 1929 Act into Chapter 62, section 49 of Title 40, which establishes the various methods by which municipalities may supply water for their public and private uses, the revisers dropped the first sentence of section 1 thereof. In doing so, of course, there was no intention to affect in any way an acquisition already made under the 1929 Act. The second sentence of section 1 of chapter 222 of the 1929 act set forth earlier herein became the first sentence of subsection (f) of R.S. 40:62-49.
Although, as must be apparent from the foregoing, the statutory language is not as informative as it might have been, consideration of all the circumstances has led us to conclude that the 1929 act provided the authority and was the authority under which Morristown acquired the Normandy Water Co. This brings us to a study of section 2 of chapter 222 of the Laws of 1929 which the Township of Morris claims confers jurisdiction on the Board of Public Utility Commissioners to pass upon the reasonableness of the water rates charged to its residents.
*203 In the 1937 revision of the statutes, section 2 of the 1929 act became unnumbered paragraph two of subsection (f) of R.S. 40:62-49. In considering the jurisdiction issue, the text of the revision may be used because no change affecting this case was made in the substance of language of that paragraph of the original statute. Subsection (f) says:
"The municipality acquiring property [as aforesaid] as provided in paragraph `d' of this section shall furnish and supply water to the adjoining municipality in which the connected distribution system is located and to any other municipality served from the same source or sources of supply when acquired, to the extent, for such length of time and under such terms and conditions as may be ordered by the board of public utility commissioners." (Emphasis added)
The bracketed words were dropped from the 1929 act and the phrase "as provided in paragraph `d' of this section" was substituted.
The Township contends that this subsection imposes a mandatory duty on Morristown to supply water to its residents. It contends further that the rates to be paid therefor by its residents are "terms" or "conditions" of the service and, accordingly, are subject to the regulatory authority of the Board of Public Utility Commissioners. On the other hand, Morristown claims the board has never regulated rates of municipally owned water utilities (except to the extent required by chapter 295, Laws of 1947, as amended by chapter 30, Laws of 1961; N.J.S.A. 40:62-85.1, relating to cities of the second class having a population of not less than 110,000 inhabitants; to be discussed hereafter). It asserts also that the phrase "under such terms and conditions" in the 1929 act and the 1937 revision, R.S. 40:62-49 (f), refers only to such matters as extension of service beyond the borders of a municipality which owns a water works plant or system, and does not comprehend rates to be charged for the water supplied. In support of its position Morristown relies upon In re Glen Rock, 25 N.J. 241 (1957); Woodside Homes, Inc. v. Town of Morristown, 26 N.J. 529 (1958).
*204 We have been referred to no statute which expressly excludes the regulation of rates charged for water supplied by public utilities municipally owned from the general supervisory authority of the board over public utilities. Nor have we been referred to any legislative enactment which expressly confers blanket regulatory power upon the board over all water utilities municipally owned. The term "public utility" is defined by R.S. 48:2-13 to include "every * * * corporation * * * that now or hereafter may own, operate, manage or control within this State any * * * water * * * plant or equipment for public use, under privileges granted or hereafter to be granted by this State * * *." No court of this State has construed that language as applicable to a municipal water utility. The Board of Public Utility Commissioners has always regarded it as limited to privately owned public utilities, and in 1926 indicated that in the absence of a clear delegation of authority to regulate rates of a municipally owned utility, it has no such power. See, Riverside Steel Casting Co., 1926C P.U.R. 105 (N.J. Bd. Pub. Util. Comm'rs 1925). That administrative interpretation of the board's jurisdiction, coming as it did three years before section 2 of the 1929 act (quoted above as R.S. 40:62-49(f)) was adopted, is not particularly weighty in the context of the present case. No party here cited a decision of the board as to the effect of the 1929 act upon the previous view of its jurisdiction. Absent any specific ruling since 1929, it should not be said that the board's failure to assume jurisdiction should be taken as influential.
We are not dealing with the power of the board to regulate the rates of a water utility municipally owned and controlled, whose service is confined within the borders of the municipality. In such cases the Legislature may not regard the need for local consumer protection as compelling. If the resident consumer-voter does not like the management or the rates, he can vote the governing body out of office, and thus achieve reform. See, City of Lamar v. Town of Wiley, 80 Colo. 18, 248 P. 1009 (Sup. Ct. 1926). That voter control is lacking *205 when the municipal utility extends its service to residents of adjoining communities. It is not a dispositive answer to say that R.S. 40:62-85 (adopted originally in 1917 as part of the Home Rule Act, L. 1917, c. 152, Art. XXXII, § 16), providing that the water shall be served to nonresident users upon as "favorable terms and conditions" as those given to local residents, supplies the safeguard. (Obviously, in this context "terms and conditions" include rates.) The cost of operating a municipal utility basically rests with the local taxpayer. If the rates are high and the operation is profitable, the excess of income over cost would pass to the municipal treasury and so ultimately benefit the taxpayer. In this situation he would not be likely to complain or to vote the governing body out of office just to aid the foreign consumer in the adjoining municipality. From a practical standpoint, therefore, if the board has no jurisdiction, the foreign consumer's only remedy would be the difficult one of a proceeding in lieu of a prerogative writ. In any event this 1917 statute can stand alongside the 1929 act (R.S. 40:62-49(f)). There is no conflict. The later statute simply says the consumer in the adjoining community shall be served under "such terms and conditions" as may be ordered by the Board of Public Utility Commissioners. Thus an expedient and expert mechanism is provided to protect the nonresident against discriminatory treatment.
In our judgment a strong case exists for broad control over the rates of a municipal utility where service is furnished beyond the corporate limits. A municipality which sells water outside its own boundaries engages in a private or proprietary enterprise. If the users in the adjoining municipality were being served by a privately owned utility, obviously the rates would be subject to regulation by the Board of Public Utility Commissioners. Logic compels the conclusion that the Legislature would not intentionally protect such consumers against arbitrary or unreasonable charges of a private utility and leave them without equal protection against discriminatory rates of a municipal utility. See, Kneier, "State Supervision *206 Over Municipally Owned Utilities," 49 Colum. L. Rev. 180, 193-197 (1949).
Our Legislature has recognized the justice of subjecting municipally owned utilities to the supervision of an expert administrative agency when service is provided for residents of adjoining communities. When the Home Rule Act was adopted in 1917, Article XXXIII was devoted to and dealt with acquisition by municipalities of plants, equipment and systems for the generation and distribution of "gas, electricity, steam, or other product" for the purpose of selling and supplying the product to its own inhabitants or to those of any other municipality. L. 1917, c. 152, p. 442 (now R.S. 40:62-12). The acts of such a municipality in supplying "electricity, gas, steam or other product" beyond its corporate limits, including the rates charged, were expressly made subject to the jurisdiction of the Board of Public Utility Commissioners to the same extent as privately owned utilities. Art. XXXIII, section 6, R.S. 40:62-24. No similar provision appeared in Art. XXXII, supra, which was entitled "Water Supply." Applying the doctrine of ejusdem generis, this Court held that the words "other product" in section 6 of Art. XXXIII did not include water. In re Glen Rock, supra, 25 N.J., at p. 247.
In 1929, however, when the Home Rule Act of 1917 was supplemented by chapter 222 of the Laws of 1929, the provisions of section 2 (now R.S. 40:62-49(f)) were added to regulate the supplying of water to residents of adjoining communities by a municipality which acquired a water plant pursuant thereto. Section 2, as quoted above, required such acquiring municipality to furnish water to the neighboring community users "to the extent, for such length of time and under such terms and conditions as may be ordered by the board of public utility commissioners." The words "terms and conditions" are often used synonymously and interchangeably. When both are employed in a statute such as that involved here, they should be regarded as emphasizing the legislative purpose to have them given the broadest possible *207 connotation. In view of the need to protect the out-of-town consumers against excessive or discriminatory rates charged by the proprietary municipal utility, the words "terms and conditions" certainly should be construed as designed to accomplish that result. The lawmakers had already supplied such protection to neighboring community users of gas, electricity, steam and other product, and, although section 3 of the 1929 act is not as explicit as Article XXXIII of the original Home Rule Act, nevertheless no straining of language is required to reach the conclusion that rates to be charged to out-of-town users are within the broad descriptive category of terms and conditions for consumption of water. Compare, City of Texarkana v. Wiggins, 151 Tex. 100, 246 S.W.2d 622 (Sup. Ct. 1952).
We do not regard In re Glen Rock, supra, or Woodside Homes, Inc. v. Town of Morristown, supra, cited by Morristown in this case, as controlling authority against a determination that the rates to be charged Township of Morris consumers are subject to utility commission regulation. In Glen Rock it appeared that in 1921 the Village of Ridgewood purchased a privately owned water utility which had been supplying the inhabitants of both municipalities with water. In 1955 Ridgewood increased its rates by ordinance, and Glen Rock filed a complaint with the Board of Public Utility Commissioners, alleging the rates were unreasonable and discriminatory as to its residents. The board dismissed the complaint saying it had no jurisdiction over such rates. The majority of this Court affirmed.
Glen Rock urged that R.S. 40:62-49(f), the revised form of chapter 222, L. 1929, unnumbered paragraph two, quoted above, conferred the required jurisdiction on the board. It argued, as the Township does here, that the "terms and conditions" mentioned in the statute for the supplying of water by Ridgewood to Glen Rock people comprehended rates. This Court said:
*208 "There is no need, however, to attempt to divine the precise meaning of R.S. 40:62-49 (f), since it is clearly inapplicable on the facts before us. This statute was enacted in 1929, eight years after Ridgewood had purchased the Bergen Aqueduct Company and had begun to supply the residents of Glen Rock with water." 25 N.J., at pp. 248-249.
The opinion went on to declare that the 1929 act operated prospectively only, and therefore could not be applied to the 1921 purchase and subsequent operation by Ridgewood of its water utility. After deciding for that reason that the Board of Public Utility Commissioners had no jurisdiction over rates charged to Glen Rock users, the Court by way of dictum cast doubt on whether the board had power to intervene even if the 1929 act were applicable. Among other things, reference was made to chapter 295, L. 1947, N.J.S.A. 40:62-85.1, which provided that when a city of the second class with a population of not less than 120,000 inhabitants (now 110,000 inhabitants, L. 1961, c. 30), owning its own waterworks, supplies water to the residents of another municipality, the rates charged shall be subject to the regulation and control of the board to the same extent as are those of a privately owned public utility. And the Court said that if the board already had general regulatory power over rates imposed by a municipal utility owner on the inhabitants of another municipality being served, there would have been no need for the 1947 act. The dictum was reiterated in Woodside Homes, Inc. v. Town of Morristown, supra, in connection with a holding that as to the waterworks involved in the present case, under the 1929 Act, R.S. 40:62-49(f), the board has jurisdiction of controversies relating to extensions of water mains. 26 N.J., at pp. 537-538. The issue of rate regulation was not in that case.
Further study of chapter 295 of the Laws of 1947 indicates that it should not reflect adversely upon the construction of R.S. 40:62-49 (f) that we feel is warranted in this case. The 1947 act obviously was intended to apply to the City of Trenton, which has owned a water supply system since about 1859. Prior to 1941 the city extended its *209 service to adjacent municipalities. See, Yardville Estates, Inc. v. City of Trenton, 66 N.J. Super. 51 (App. Div. 1961). Problems arose about the reasonableness of the extra-territorial rates. Serious question existed as to whether R.S. 40:62-49 (f) applied to Trenton because its waterworks long pre-existed the 1929 act. To remove the question, N.J.S.A. 40:62-85.1, the 1947 statute, was adopted, to make clear that the board had regulatory power over rates charged by Trenton to out-of-city consumers. The statement attached to the bill when introduced says:
"The purpose of this bill is to give the board of public utility commissioners jurisdiction over the rates charged by a municipality for water supplied to consumers outside of the municipal limits. At the present time there are many situations where the rates charged are subject to no control whatsoever, and the supplying municipality may charge any arbitrary rate it desires and the person or municipality receiving the water has no redress. The board of public utility commissioners is the proper body to regulate and control these rates the same as it controls the rates of water companies."
Thus the spirit of the statute, particularly in light of the supporting statement, lends support rather than hindrance to the idea that extra-territorial users of water sold to them by a utility owned by an adjoining municipality were intended to be protected against unreasonable charges by virtue of R.S. 40:62-49 (f), when applicable, and that the right to enforce such protection was committed to the Board of Public Utility Commissioners.
Under all the circumstances we hold the view that the board has jurisdiction of the complaint presented to it in this case, and that it should have undertaken to hear and determine the Township's claim that the water rates sought to be imposed on its inhabitants are unreasonable and discriminatory. Our decision goes no further than the specific issue presented here; namely, that in cases within N.J.S.A. 40:62-49 (f), when water is supplied to the inhabitants of an adjoining municipality, the board has jurisdiction over the terms and conditions under which it is supplied, *210 including the rates charged to such extra-territorial consumers.
Accordingly the order of the board is reversed and the matter is remanded for hearing and determination. The scope of the proceeding is left to the expertise of the board. It may be that the reasonableness and nondiscriminatory character of the rates Morristown is attempting to charge Morris Township users can be determined without a full inquiry into the reasonableness of the rates imposed on the local users. If, however, the Township's claim cannot be decided without such a full inquiry, the demands of justice cannot sanction its avoidance.
For reversal and remandment  Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN  7.
For affirmance  None.